# UNITED STATES DISTRICT COURT
### for the
### Eastern District of California

**FILED**

Oct 18, 2024

CLERK, U.S. DISTRICT COURT
EASTERN DISTRICT OF CALIFORNIA

**SEALED**

| | |
|---|---|
| United States of America | ) |
| v. | ) |
| | ) Case No. |
| **RAYSHAWN WILLIAMS** | ) |
| | ) |
| *Defendant(s)* | ) |

Case No. 2:24-mj-0127 SCR

## CRIMINAL COMPLAINT

I, the complainant in this case, state that the following is true to the best of my knowledge and belief.

On or about the date(s) of ___June 7, 2024, and June 27, 2024___ in the county of ___San Joaquin___ in the ___Eastern___ District of ___California___, the defendant(s) violated:

| Code Section | Offense Description |
|---|---|
| 18 U.S.C. § 922(o) | Possession and transfer of a machine gun |
| 18 U.S.C. § 922(o) | Possession and transfer of a machine gun |

This criminal complaint is based on these facts:

Please see attached Affidavit, incorporated here by reference.

☒ Continued on the attached sheet.

/s/ Payton Smith
_____
*Complainant's signature*

ATF Special Agent Payton Smith
_____
*Printed name and title*

Sworn to me and signed via telephone.

Date: ___October 18, 2024___

_____
*Judge's signature*

City and state: ___Sacramento, California___

Sean C. Riordan, U.S. Magistrate Judge
_____
*Printed name and title*

## AFFIDAVIT IN SUPPORT OF A CRIMINAL COMPLAINT

I, Payton Smith, a Special Agent with the Bureau of Alcohol, Tobacco, Firearms and Explosives ("ATF"), being duly sworn, hereby state as follows:

## I.    INTRODUCTION

1.    I respectfully submit this Affidavit in support of the issuance of a criminal complaint and a federal arrest warrant for Rayshawn WILLIAMS.

2.    As set forth below, this criminal complaint application arises from an ongoing investigation into firearms trafficking by the individual described below.  The criminal activities outlined below include the sale of privately made firearms (PMFs) and commercially manufactured firearms (CMFs), some of which were modified with machine gun conversion devices or "Glock switches," the sale of machine gun conversion devices, the suspected shipping/transport of firearms and/or firearm components to/from other states, all in violation of federal law.

3.    The facts in this Affidavit come from my personal observations, my training and experience, information from records and databases, and information obtained from other law enforcement officers and confidential informants. Because this Affidavit is submitted for the limited purpose of establishing probable cause in support of the application for a search warrant, it does not set forth each and every fact that I or others have learned during the course of this investigation.  I have only included what I believe to be adequate facts to establish probable cause for the requested complaint and warrant.

## II.    AFFIANT BACKGROUND

4.    I am a Special Agent with the U.S. Bureau of Alcohol, Tobacco, Firearms and Explosives (ATF), and have been so employed since March 2020. I am presently assigned to the

ATF Stockton Field Office in Stockton, California. I am an investigative or law enforcement officer of the United States within the meaning of 18 U.S.C. § 2510(7), that is, an officer of the United States who is empowered by law to conduct investigations of and to make arrests for offenses enumerated in 18 U.S.C. § 2516.  I was trained as an ATF Special Agent at the Federal Law Enforcement Training Center in Glynco, Georgia, and am a graduate of the Federal Law Enforcement Training Center Criminal Investigator Training Program and the ATF National Academy Special Agent Basic Training Course.

5.     As an ATF Special Agent, I have been trained to conduct and participate in both state and federal investigations involving the trafficking of firearms and trafficking and distribution of controlled substances.  I have received training in investigating and assisting in the prosecution of criminal street gangs engaged in illegal narcotics and firearms trafficking.  I have received training and participated in various types of investigative techniques, including using electronic surveillance, undercover agents, and informants.

6.     During the course of my employment with ATF, I have investigated criminal violations relating to firearms, explosives, arson, violent crime, criminal street gangs, and narcotics.  I have participated in all aspects of criminal investigations, including, but not limited to, interviews, physical and electronic surveillance, and the execution of search warrants.  I have personally investigated and/or assisted other agents and officers in their investigations involving violations of Title 18, United States Code, Section 924(c), use and/or possession of a firearm during and in furtherance of a drug trafficking crime; Title 26, United States Code, as it pertains to Title II of the National Firearms Act; Title 21, United States Code, Section 841(a)(1), the manufacture of, distribution of and possession with intent to distribute controlled substances; and Title 21, United States Code, Section 846, conspiracy to commit the foregoing.  I am familiar

with, and have participated in, conventional investigative methods, including, but not limited to, electronic surveillance, visual surveillance, and the use of GPS data, pen registers and trap and trace devices, questioning of witnesses, search warrants, and confidential informants.

7.      I have also been trained as an expert on the manufacturing, origin, importation, and marking of commercially and privately made firearms.  This training and experience includes examining hundreds of firearms and rounds of ammunition for the purpose of determining information, including: manufacturer, model, caliber/gauge, and serial number; the place of manufacturer, function and design and/or status as related to the National Firearms Act. I have also attended the ATF Firearms Interstate Nexus Training Course in Martinsburg, West Virginia.

### III.    APPLICABLE STATUTES

8.      18 U.S.C. § 922(a)(1)(A) – Dealing in firearms without a license

9.      18 U.S.C. § 922(o)(1) – Transfer/possess unregistered machine gun

10.     26 U.S.C. § 5861(d) – Possession of unregistered National Firearms Act (NFA) firearm

11.     26 U.S.C. § 5861(e) – Transferring a firearm in violation of NFA

12.     26 U.S.C. § 5861(h) – Transfer/receive/deliver an unregistered NFA firearm

## IV.    CHARGES

13.    This Affidavit requests a Criminal Complaint against Rayshawn WILLIAMS

based upon probable cause to believe that he committed the following crimes:[1]

> Count 1: On or about June 7, 2024, Rayshawn WILLIAMS knowingly and
>
> intentionally possessed and transferred a machine gun in violation of
>
> 18 U.S.C. § 922(o)(1).
>
> Count 2: On or about June 27, 2024, Rayshawn WILLIAMS knowingly and
>
> intentionally possessed and transferred a machine gun in violation of
>
> 18 U.S.C. § 922(o)(1).

## 14.    PROBABLE CAUSE

**May 2024 – ATF Confidential Informant makes contact with firearms trafficker
Rayshawn WILLIAMS after seeing guns offered on Instagram**

15.    In May 2024, an ATF confidential informant ("CI-1") informed ATF Special

Agent Smith that he/she had identified an individual on Instagram with the handle *rayrizz34* who

was advertising firearms for sale. The firearms being advertised for sale by *rayrizz34* included

multiple commercially manufactured Glock pistols, and what appeared to be machine gun

conversion devices (MCD). Based upon his training and experience, ATF SA Smith knows that

MCDs are often installed onto commercially and privately manufactured firearms to convert

them from semi-automatic to fully automatic.

16.    SA Smith showed a photograph from the Instagram page with the handle

*rayrizz34* to Stockton Police Department (SPD) Gang Violence Investigations Unit (GVSU)

---

[1]    Although this Affidavit details multiple, additional crimes committed by
WILLIAMS during this investigation, it requests a finding of probable cause on two of the
crimes at this time.  The United States anticipates presenting additional charges to a grand jury
after execution of the arrest warrant requested in this Affidavit.

Detective C. Mahnke, who positively identified *rayrizz34* as Rayshawn WILLIAMS (DOB: xx/xx/05[2]). In addition, Detective Mahnke identified WILLIAMS as an East Side Crip gang member based upon his unit's training, experience, and street intelligence about the various gangs in Stockton and WILLIAMS's connection to the East Side Crip gang.

17.     On May 6, 2024, CI-1 messaged WILLIAMS using the messaging feature in Instagram. WILLIAMS told CI-1 that he had multiple firearms for sale. WILLIAMS and the CI negotiated prices and WILLIAMS agreed to sell two firearms to CI-1.

**Information about CI-1 and CI-2**

18.     CI-1 1 is assisting law enforcement because he/she is paid for information and work provided to law enforcement in furtherance of criminal investigations. CI-1's criminal history includes misdemeanor convictions for trespassing, battery, and assault, and felony convictions for possession of a controlled substance for sale, and robbery. CI-1 has participated in over 175 undercover operations for federal, state and local law enforcement agencies. During this investigation, I am not aware of information provided by CI-1 that is false or misleading. For these reasons, I believe that CI-1 is reliable in this investigation.

19.     CI-2 is assisting law enforcement because he/she is paid for information and work provided to law enforcement in furtherance of criminal investigations. CI-2's criminal history includes arrests for driving under the influence and with a suspended license and inflicting corporal injury on a spouse. CI-2 does not have any criminal convictions. CI-2 has participated in over 75 undercover operations for federal, state, and local law enforcement agencies. During

---

[2]     The full date of birth for Rayshawn WILLIAMS, as well as his FBI number and other related identifiers are maintained in the investigative file. Because this criminal complaint affidavit will eventually be made public, I have not included all of those details in order to protect against someone using WILLIAMS's personal identifying information in an improper manner. The same is true of additional, uncharged subjects who are identified in the Affidavit as part of this investigation.

this investigation, I am not aware of information provided by CI-2 that is false or misleading. For these reasons, I believe CI-2 is reliable in this investigation.

**May 9, 2024 – Controlled Purchase of a firearm from WILLIAMS in Stockton**

20.     On May 9, 2024, an undercover operation took place. After a pre-operational briefing, SA Smith and TFO Roman met with CI-1 and a second ATF confidential informant ("**CI-2**"). SA Smith searched both CIs for contraband and currency with negative results. CI-1 and CI-2 were briefed on their role in the operation and SA Smith provided CI-1 with pre-recorded government funds. At approximately 1:01 p.m., the CIs departed the staging area.

21.     At approximately 1:03 p.m., WILLIAMS texted CI-1 a photograph via phone number 209-901-2993 of his location inside of the Target parking lot located at 4707 Pacific Avenue, Stockton. Surveillance units in the Target parking lot observed a white Lincoln sedan bearing California license plate 9KUT487,[3] occupied by an individual matching WILLIAMS's description, and parked in an area similar to the photograph that WILLIAMS sent CI-1. The registered address for the above-mentioned Lincoln is 2337 E Taylor Street, Stockton, California. The registered owner for the above-mentioned Lincoln is Jenny Oliver (DOB: xx/xx/81), who is believed to be WILLIAMS' mother.

22.     At approximately 1:10 p.m., CI-1 and CI-2 arrived at the Target parking lot and parked near the white Lincoln. Surveillance observed WILLIAMS exit the driver seat of the white Lincoln and walk toward the vehicle in which the CIs were seated. CI-2 exited the front passenger seat of the CI's vehicle, and WILLIAMS got into the vehicle. While inside the CI's vehicle, CI-1 asked WILLIAMS if the firearm he/she was purchasing was "the one with the switch." SA Smith understands "switch" to be a reference to a machine gun conversion device,

---

[3]     The registered owner of the vehicle is listed as Jenny Cornelia Oliver.

as they are often referred to as "switches" or "Glock switches." WILLIAMS told CI-1 that he

had sold that firearm but had brought another for the CI. WILLAMS produced a Glock 45, 9mm,

bearing serial number BTGV587 to CI-1, and CI-1 paid WILLIAMS with pre-recorded

government funds. WILLIAMS and CI-1 were heard via electronic surveillance negotiating

future firearms purchases.

23.     At approximately 1:13 p.m., surveillance observed WILLIAMS exit the CIs'

vehicle, walk back to the white Lincoln, get into the driver seat, and depart the area. Surveillance

units also observed a female passenger in the white Lincoln. At approximately 1:18 p.m., agents

terminated surveillance of the white Lincoln and WILLIAMS.

24.     CI-1 and CI-2 returned to a pre-determined location and were followed by SA

Smith and TFO Roman. Upon arrival, the SA Smith searched the CIs for contraband and

unauthorized currency with negative results. SA Smith and TFO Roman then conducted a debrief

of CI-1 . According to CI-1, when they arrived at the Target parking lot and parked, WILLIAMS

walked to the CIs' vehicle and got into the front passenger seat. According to CI-1, WILLIAMS

took a Glock 45 out of his waistband, removed the magazine from the firearm, and racked the

slide which ejected a round from the chamber of the firearm. CI-1 said WILLIAMS proceeded to

wipe down the firearm, then handed the firearm to the CI-1. CI-1 said he/she paid $1,200 to

WILLIAMS for the Glock 45. CI-1 said he/she and WILLIAMS negotiated future firearms deals.

WILLIAMS also told the CI he was from "out east;" SA Smith understood as a reference to

WILLIAMS being an East Side Crip gang member.

**May 13, 2024 – Controlled Purchase of a Firearm from WILLIAMS in Stockton**

25.     On May 13, 2024, an undercover operation took place.  After a pre-operational

briefing, SA Smith and SA Perryman met with CI-1 and CI-2. SA Perryman searched the CIs for

contraband and unauthorized currency with negative results. CI-1 and CI-2 were briefed on their role in the operation, and SA Smith provided CI-1 with pre-recorded government funds. At approximately 1308 hours, the CIs departed the staging area.

26.    At approximately 1318 hours, CI-1 and CI-2 arrived at the Target parking lot and called WILLIAMS using the Instagram messaging call feature. WILLIAMS answered and told CI-1 that he was in the Target parking lot, located at 4707 Pacific Avenue. Surveillance units observed WILLIAMS standing outside of a white Cadillac Escalade ("White Escalade") bearing California license plate 6UFR750. Surveillance units observed WILLIAMS walk from the Cadillac to the CI vehicle. At approximately 1:19 p.m., CI-2 exited the front passenger seat of the CI vehicle, and WILLIAMS got into the front passenger seat of the vehicle. While inside of the CIs' vehicle, WILLIAMS told CI-1 that he will "have some packs on the floor." CI-1 asked WILLIAMS if they would be "indoor" and WILLIAMS confirmed that they would be. WILLIAMS further told the CI "we finna hit a little club" and that he could give the CI a "good ticket." Based upon his training and experience, SA Smith understood "packs" to mean marijuana. SA Smith interpreted WILLIAMS's comments to CI-1 to mean that WILLIAMS was preparing to rob a marijuana dispensary or club and would soon be able to sell pounds or marijuana for a low price to CI-1.

27.    While inside the CIs' vehicle, WILLIAMS supplied CI-1 with a Glock 19, 9mm, bearing serial number BUAR511, and the CI-1 paid WILLIAMS with pre-recorded government funds. As WILLIAMS was exiting the CI vehicle, he told CI-1 that there was "one on top," which was a reference to the fact that the firearm he had sold the CI-1 was loaded with a round in the chamber.

28.     At approximately 1:21 p.m., WILLIAMS broke contact with CI-1, and the CIs departed the area. Surveillance units observed WILLIAMS return to the White Escalade and depart the area as a passenger of that vehicle. The White Escalade drove to a liquor store located at 3120 E Main Street in Stockton, and agents observed WILLIAMS go into the store, and return to the vehicle before departing. Surveillance units observed the vehicle drive to 3227 E Taylor Street and park in front of the residence. WILLIAMS exited the White Escalade wearing an orange hoodie and walked to the front porch of 3227 E Taylor accompanied by an unidentified female. The White Escalade departed the area and surveillance was terminated.

29.     After the controlled purchase, CI-1 and CI-2 returned to a pre-determined location and were followed by SA Smith and SA Perryman. Upon arrival, SA Smith searched the CIs for contraband and unauthorized currency with negative results. Agents debriefed CI-1 and CI-2. CI-1 said that when they arrived at the Target parking lot, they called WILLIAMS. WILLIAMS told CI-1 he was already in the lot and parked in the same area he had previously met with CI-1. CI-1 stated that after they parked, WILLIAMS walked to the CI vehicle and got into the front passenger seat. CI-1 said that WILLIAMS removed a Glock 19 from his waistband and gave it to CI-1. CI-1 stated he/she paid $1,100 to WILLIAMS in exchange for the Glock 19. CI-1 explained that he interpreted comments made to him/her by WILLIAMS that he was going to rob a marijuana dispensary and, as a result, would be able to sell marijuana to CI-1 for a good price.

**May 28, 2024 – Controlled purchase of a firearm from WILLIAMS in Stockton**

30.     On May 28, 2024, an undercover operation took place. TFO Keeney searched CI-1 for contraband and unauthorized currency with negative results. Agents briefed CI-1 on his/her role in the operation and TFO Keeney provided CI-1 with pre-recorded government funds. At approximately 3:15 p.m., CI-1 departed the staging area.

31.    At approximately 3:28 p.m. CI-1 arrived near the northeast corner of the parking lot of 4707 Pacific Avenue and called WILLIAMS to find out where he was and what type of vehicle he was in. At approximately 3:28 p.m., surveillance units observed CI-1 drive to the northeast corner of the parking lot. Surveillance units observed the CI vehicle park near a white Cadillac Escalade "White Escalade" (displaying California license plate number 6UFR750). Agents previously spotted this White Escalade during the earlier controlled purchase on May 13, 2024 – during that gun deal, WILLIAMS as a passenger in the Escalade. CI-1 pulled in the parking stall next to the White Escalade on the passenger side. TFO Keeney observed WILLIAMS exit the front driver side of the White Escalade, walk around to the rear passenger side door, and retrieve an object from the rear of the vehicle. TFO Keeney observed WILLIAMS grab the object and place the item in his waistband and walk over to the front passenger door of the CI vehicle and get in.  WILLIAMS entered the front passenger compartment of the CI vehicle. TFO Keeney heard WILLIAMS ask CI-1 if CI-1 knew of anyone who had money on their heads because it is what his crew specializes in. SA Smith understood this to mean WILLIAMS was offering to carry out a contract murder-for-hire for CI-1

32.    In reviewing video surveillance from the deal, WILLIAMS can be seen removing an "AR" style pistol from his waistband and handing it to CI-1. CI-1 and WILLIAMS talk about future firearms deals, specifically about a Glock pistol converted into a machine gun with a 50-round magazine. TFO Keeney observed WILLIAMS exit the CI vehicle at approximately 1530 hours.

33.    At approximately 3:30 p.m., CI-1 departed from the parking lot and followed TFO Keeney to a pre-determined location. At that location, TFO Keeney collected monitoring/recording devices, three detached magazines, and one privately manufactured AR-15

style pistol.  The PMF also had had no serial numbers or manufacturer markings. TFO Keeney observed ammunition was sold with the firearm.

**June 7, 2024 – Controlled purchase of a firearm from WILLIAMS in Stockton**

34.     On June 7, 2024, an undercover operation took place.  After a pre-operational briefing, SA Smith and TFO Keeney met with CI-1 and CI-2. TFO Keeney searched the CIs for contraband and unauthorized currency with negative results. CI-1 and CI-2 were briefed on their roles in the operation and SA Smith provided CI-1 with pre-recorded government funds. At approximately 12:32 p.m., the CIs departed the staging area.

35.     At approximately 12:41 p.m., CI-1 and CI-2 arrived at the Target parking lot. At approximately 12:43 p.m., CI-1 observed WILLIAMS exit a dark colored Lexus sedan bearing California license plate 5VPP904[4] wearing a blue hooded sweatshirt. CI-2 exited the front passenger seat of the CI vehicle, and WILLIAMS got into the front passenger seat of the CI vehicle. When WILLIAMS got into the CI vehicle, he told CI-1 "it came fully up though… came one up top fifty one." SA Smith understood WILLIAMS to be saying that the firearm WILLIAMS was offering to sell to CI-1 had a fully loaded drum magazine, with one round in the chamber.

36.     Further, while WILLIAMS was inside of the CI vehicle, he removed a Glock box from a brown leather backpack and gave it to CI-1. The Glock box contained a Glock 45, 9mm bearing serial number BYCH256, and an installed machine gun conversion device. CI-1 paid WILLIAMS with pre-recorded government funds. As WILLIAMS was exiting the vehicle, he told CI-1 that he "had another one coming." SA Smith understood WILLIAMS to mean that he

---

[4]     The registered owner of the vehicle is Loretta Salis, 1334 Princess Drive, Stockton, California.

would soon another firearm for sale. CI-1 and WILLIAMS discussed WILLIAMS selling CI-1 "switches" (devices that convert firearms from semi-automatic firearm capacity to fully-automatic firing capacity).

37.     At approximately 12:45 p.m., WILLIAMS exited the CI vehicle. Surveillance units observed WILLIAMS walk back to the dark colored Lexus and get into the rear of the vehicle. At approximately 12:46 p.m., the Lexus departed the area. Surveillance units followed the Lexus but lost sight of it. At approximately 1:21 p.m., agents terminated surveillance.

38.     After the gun deal, CI-1 and CI-2 returned to a pre-determined location and were followed by SA Smith and TFO Keeney. Upon arrival, SA Smith searched the CIs for contraband and unauthorized currency with negative results. Agents debriefed CI-1 and CI-2. According to CI-1, they saw WILLIAMS get out of the rear passenger seat of the Lexus, walk to the CI vehicle, and get into the front passenger seat while CI-2 waited near the front of the CI vehicle. CI-1 said he/she and WILLIAMS discussed WILLIAMS conducting a murder for hire for CI-1. WILLIAMS said he could do that for CI-1. CI-1 said WILLIAMS gave him/her a Glock box with the Glock 45 and an installed machine gun conversion device inside of the box. According to CI-1 stated he/she paid WILLIAMS $1,500 for the Glock 45, and removed the round that was chambered in the firearm. CI-1 said they discussed future firearm purchases with WILLIAMS.

**June 14, 2024 – Controlled purchase of a firearm from WILLIAMS in Stockton**

39.     On June 14, 2024, an undercover operation took place. After a pre-operational briefing, SA Smith and TFO Keeney met with CI-1 and C-2. TFO Keeney searched the CIs for contraband and unauthorized currency with negative results. Agents briefed CI-1 and CI-2 on their role in the operation and SA Smith provided CI-1 with pre-recorded government funds. CI-

1 told SA Smith that WILLIAMS told CI-1 that he was bringing the firearm source for the AK

rifle to this deal. In addition, WILLIAMS told CI-1 that the source was "out on a case" and that

the deal would have to take place somewhere in "the West." SA Smith understood WILLIAMS

to be explaining to CI-1 that the source of the firearm was out on bail for a pending court case

and wanted to remain in an area where they were comfortable, and with a low law enforcement

presence. Further, SA Smith understood in "the West" to mean somewhere within West

Stockton, which is an area commonly claimed by the West Side Blood criminal street gang.

WILIAMS told CI-1 that the deal would take place at 1107 N Ryde Avenue in Stockton.

40.     At approximately 11:50 a.m., CI-1 spoke with WILLIAMS on a voice call via

Instagram messaging. WILLIAMS told CI-1 that he was at the meet location, was wearing an

orange hoodie, and driving a white truck. Surveillance units observed a white Cadillac Escalade

bearing California license plate number 6UFR750 parked in the parking lot of 1107 N Ryde

Avenue. At approximately 12:02 p.m., the CIs departed the staging area. At approximately

12:10 p.m., CI-1 and CI-2 arrived at the deal location. The CIs observed the white Escalade

parked in the lot of the deal location, and a female in the backseat of the vehicle. At

approximately 12:12 p.m., CI-2 exited the CI vehicle and stood near the front of the car.

Surveillance observed WILLIAMS exit the driver seat of the White Escalade wearing an orange

hooded sweatshirt. WILLIAMS walked to the CI vehicle and got into the front passenger seat.

Surveillance equipment inside the CI vehicle showed an AK-style firearm tucked into the front

of WILLIAMS's pants.

41.     WILLIAMS removed the firearm from his pants, handed the firearm to CI-1 and

got into the CI vehicle. As he was getting into the CI vehicle, WILIAMS told CI-1 "this my

nigga that be having the switches." WILLIAMS was referencing an Asian male that was

standing outside the CI vehicle talking to CI-2. CI-1 paid WILLIAMS with pre-recorded

government funds. At that time, WILLIAMS motioned to the Asian make talking to CI-2 to

come and get into the CI vehicle. WILLIAMS was observed on the electronic surveillance

equipment counting the pre-recorded funds that CI-1 had paid him. The Asian male later

identified as "Co-Conspirator 1" got into the rear passenger seat of the CI vehicle.[5] WILLIAMS

proceeded to hand the money to "Co-Conspirator 1" in the back seat of the CI vehicle. CI-1 and

Co-Conspirator 1 discussed machine gun conversion devices which are commonly referred to as

Glock switches.  Co-Conspirator 1 told CI-1 he had them for sale "for $200 a pop for real."

  42. Co-Conspirator 1 told CI-1 that he had another firearm that he would sell to CI-1.

Co-Conspirator 1 then took a Glock out of his waistband and showed it to CI-1. Co-Conspirator

1 described the firearm as a "19 Gen 4… with a switch on it." SA Smith understood Co-

Conspirator 1's description to mean that the firearm was a Glock, Model 19 Gen 4, 9mm.

Further, SA Smith understood this to mean Co-Conspirator 1 was saying a machine gun

conversion device or Glock switch was installed on the firearm (thus permitting it to fire in a

fully-automatic capacity). CI-1 asked Co-Conspirator 1 "what you got in there? A thirty?" in

reference to the extended magazine and ammunition capacity in the firearm. Co-Conspirator 1

responded saying "a forty." Co-Conspirator 1 told CI-1, "I paid thirteen for the gun and I spent

two hundred on the… switch." CI-1 offered Co-Conspirator 1 "fourteen or fifteen" for the

firearm and Co-Conspirator 1 responded saying he would take sixteen for it. Co-Conspirator 1

told CI-1: "I got a mini drake too." SA Smith understood this to be a reference to a mini-Draco,

AK style pistol. Co-Conspirator 1 told CI-1 he wanted $2,500 for the mini-Draco. CI-1 asked

---

[5] Consistent with information relayed by CI-1 from WILLIAMS, investigators later confirmed with the Stockton Police Department Gang Violence Suppression Unit (GVSU) that Co-Conspirator 1 was on release from jail for a pending gang investigation.

Co-Conspirator 1 if he had any "baby A's," in reference to small AR style rifles, or AR pistols. Co-Conspirator 1 told the CI he had two "baby A's right now" and that the CI "could cash him out." CI-1 asked WILLIAMS and Co-Conspirator 1, "what section is this right here?" in reference to where they were meeting. WILLIAMS and Co-Conspirator 1 both responded, "out west."

43.     At approximately 12:13 p.m., WILLIAMS and Co-Conspirator 1 exited the CI vehicle and returned to the white Escalade. WILLIAMS got into the drive seat of the white Escalade, and Co-Conspirator 1 into the passenger seat. The CIs departed the area. After the gun deal, CI-1 and CI-2 returned to a pre-determined location and were followed by SA Smith. Upon arrival, SA Smith searched the CIs for contraband and unauthorized currency with negative results.

44.     Agents conducted a debrief of CI-1 and CI-2. CI-1 and CI-2 said they saw WILLIAMS exit the white Cadillac. CI-2 exited the CI vehicle and stood near the hood of the car. CI-1 said that WILLIAMS walked to the CI vehicle, handed the CI the AK-style rifle and got into the vehicle. CI-2 said that Co-Conspirator 1 approached him/her and offered to sell them switches. CI-1 said that WILLIAMS then motioned for Co-Conspirator 1 to get into the CI vehicle and Co-Conspirator 1 got into the rear passenger side seat. CI-1 said they discussed Co-Conspirator 1 selling the CI Glock switches. Co-Conspirator 1 showed the CI a Glock with a switch that was tucked in his waistband and offered to sell it to CI-1 for $1,600. Co-Conspirator 1 told the CI he could sell him/her mini-Dracos and "Baby A's." Co-Conspirator 1 told CI-1 to call WILLIAMS if they wanted to buy switches or anything else.

**June 20, 2024 – Controlled purchase of firearms from WILLIAMS and
Co-Conspirator 1**

45.    On June 20, 2024, an undercover operation took place. After a pre-operational briefing, TFO Keeney and CDCR SSU SA Prentice met with CI-1 and CI-2. TFO Keeney searched the CIs for contraband and unauthorized currency with negative results. TFO Keeney briefed the CIs on their role in the operation and provided CI-1 with pre-recorded government funds. Prior to the deal, CI-1 had arranged to purchase an AK style firearm and a Glock pistol from WILLIAMS.

46.    At approximately 12:55 p.m., CI-1 and CI-2 arrived at the pre-arranged deal location at 4707 Pacific Avenue in Stockton. At approximately 12:57 p.m., CI-1 sent WILLIAMS a message via Instagram Messenger asking where WILLIAMS was located. WILLIAMS replied saying he that he would be there in ten minutes.

47.    At approximately 1:13 p.m., surveillance units observed the White Cadillac Escalade (White Cadillac) bearing California license plate 6UFR750 enter the parking lot located at 4707 Pacific Avenue. Surveillance observed WILLIAMS driving the White Cadillac and parking the vehicle near the CI vehicle. WILLIAMS exited the driver seat of the White Cadillac and walked toward the CI vehicle.

48.    At approximately 1:19 p.m., WILLIAMS got into the front passenger seat of the CI vehicle. Surveillance units observed Co-Conspirator 1 exit the White Cadillac and walk toward a white Chevrolet Silverado (White Chevy) bearing California license plate 8T46533. The registered owner of this vehicle is Pascual Rodriguez Jr. (DOB: xx/xx/87). Agents observed Co-Conspirator 1 retrieving a white, laundry style basket from the White Chevy and getting into the CI vehicle with the basket.

49.    Once in the CI vehicle, Co-Conspirator 1 removed an FN, Model FiveSeveN pistol bearing serial number 386350754, and one loaded magazine for the pistol from the laundry

basket and handed it to CI-1. Co-Conspirator 1 also removed a Century Arms, Model Micro Draco, pistol bearing serial number PMD-47663, and one loaded magazine for the pistol, from the laundry basket and handed it to CI-1. CI-1 paid WILLIAMS for the firearms with pre-recorded government funds. WILLIAMS proceeded to hand the money to Co-Conspirator 1 in the back-seat of the CI-1 vehicle.

50.     At approximately 1:21 p.m., WILLIAMS and Co-Conspirator 1 broke contact with the CIs and the CIs departed the deal location followed by TFO Keeney. TFO Keeney followed the CIs to a pre-arranged location and they did not make any unscheduled stops.

### June 27, 2024 – Controlled Purchase of a Firearm from WILLIAMS

51.     On June 27, 2024, an undercover operation took place. CI-1 arranged the purchase with WILLIAMS via Instagram Messenger. After a pre-operational briefing, SA Smith and TFO Keeney met with CI-1 and CI-2. SA Smith searched the CIs for contraband and unauthorized currency with negative results. CI-1 and CI-2 were briefed on their role in the operation. SA Smith provided CI-1 with pre-recorded government funds for the controlled purchase. Prior to the arranged time, CI-1 called WILLIAMS via Instagram Messenger and WILLIAMS changed the location of the deal to 721 McDonnel Avenue in Stockton. It should be noted that WILLIAMS's home address is 2337 E Taylor Street, which is approximately half a block from the new deal location that WILLIAMS provided to CI-1.

52.     At approximately 4:18 p.m., the CIs departed the staging area. At approximately 4:30 p.m., surveillance units observed WILLIAMS in the driveway of 2337 E Taylor Street wearing a grey hooded sweatshirt and jeans.

53.     At approximately 4:30 p.m., CI-1 and CI-2 arrived at the area around 721 McDonnell Avenue. CI-1 told WILLIAMS they had arrived via Instagram Messaging. At

approximately 4:32 p.m., surveillance units observed WILLIAMS leave the area around E Taylor Street and walk east toward McDonnel and get into the CI vehicle.

54.     While in the CI vehicle, WILLIAMS told the CIs that he only had the Glock he had arranged to sell CI, and that he did not have the AK style pistol at that time. WILLIAMS gave CI a Glock 19, Gen 5, 9mm pistol bearing serial number BTCU944 with an installed machine gun conversion device (MCD) and an extended magazine. CI-1 paid WILLIAMS with pre-recorded government funds. CI-1 and WILLIAMS discussed the CI purchasing stolen jewelry from WILLIAMS. WILLIAMS described to the CI how he robs jewelry stores.

55.     At approximately 4:35 p.m., WILLIAMS exited the CI vehicle and walked back in the direction of 2337 E Taylor Street. At that time the CIs departed the area and drove to a pre-determined staging area.

56.     A debrief of CI-1 and CI-2 was conducted by SA Smith and TFO Keeney. CI-1 said that WILLIAMS got into the CI vehicle and removed the firearm from his waist. CI-1 stated that WILLIAMS gave them the Glock 19 bearing serial number BTCU944 with an installed MCD, and CI-1 paid WILLIAMS in pre-recorded government funds. The CIs stated that they discussed jewelry store robberies with WILLIAMS.

**July 12, 2024 – Controlled purchase of firearms from WILLIAMS and Co-Conspirator 2**

57.     On July 12, 2024, an undercover operation took place. CI-1 arranged the purchase with WILLIAMS via Instagram Messenger. After a pre-operational briefing, SA Smith and CDCR SSU SA Prentice met with CI-1 and CI-2. SA Smith searched the CIs for contraband and unauthorized currency with negative results. CI-1 and CI-2 were briefed on their role in the operation. SA Smith provided CI-1 with pre-recorded government funds for the controlled purchase.

58.     At approximately 11:52 a.m., the CIs departed the staging area. At approximately

12:06 p.m., the CIs arrived at the area of South McDonnell Avenue and East Taylor Street. CI-1

contacted WILLIAMS via Instagram Messaging and told him they had arrived at the deal

location. WILLIAMS told CI-1 that he would be there shortly. Prior to the CIs arriving at the

deal location, surveillance units observed WILLIAMS coming in and out of the residence located

at 2337 East Taylor Street. Surveillance units also observed the white Cadillac Escalade ("White

Escalade") bearing California license plate 6UFR750 parked in the driveway of 2337 East Taylor

Street. Agents observed WILLIAMS going into and out of the White Escalade.

59.     At approximately 12:10 p.m., agents observed WILLIAMS exiting 2337 East

Taylor Street wearing a grey hoodie and walking west on East Taylor Street toward the deal

location. At approximately 12:11 p.m., WILLIAMS contacted the CIs and got into the rear

passenger seat of the CI vehicle.

60.     WILLIAMS told the CIs, "hey I'm waiting for my nigga," meaning he was

waiting for his firearms source to arrive. While in the CI vehicle waiting for the firearm source,

WILLIAMS told the CIs he commits robberies at jewelry stores and explained how he carries

out the robberies. WILLIAMS told the CIs he "hit Kims jewelry for like damn near two

hundred." SA Smith understood this to be a reference to robbing a jewelry store for two hundred

thousand dollars in jewelry.[6]

61.     At approximately 12:37 p.m., WILLIAMS exited the CI vehicle and returned to

his residence at 2337 East Taylor Street. A short time later, WILLIAMS exited the residence and

returned to the deal location.

---

[6]     Investigators confirmed that, in 2023, an Oakland business with "Kim's" in its
name was the victim of criminal activity.

62.     At approximately 12:40 p.m., a white Toyota Camry ("White Camry") bearing California license plate 8HNR600 arrived at the deal location and parked behind the CI vehicle. The driver of the White Camry was identified by the CIs as "Co-Conspirator 2." CI-1 and CI-2 had previous dealings with Co-Conspirator 2 on a separate and unrelated investigation. WILLIAMS approached the CI vehicle and asked the CIs if they wanted to come look at the firearms.

63.     Agents observed Co-Conspirator 2 exiting the driver seat of the White Camry and going to the rear of the vehicle to open the trunk. Agents observed Co-Conspirator 2 taking something out of the trunk that was wrapped in a blanket and getting into the back seat of the White Camry with the item. Agents also observed WILLIAMS getting into the back seat of the White Camry. CI-1 gave CI-2 the pre-recorded government funds to conduct the controlled purchase from Co-Conspirator 2.

64.     At approximately 12:41 p.m., CI-2 exited the CI vehicle, walked to the White Camry, got into the vehicle and contacted Co-Conspirator 2. Co-Conspirator 2 showed CI-2 two AR style pistol wrapped in a blanket, and CI-2 paid Co-Conspirator 2 the pre-recorded government funds. CI-2 told Co-Conspirator 2 they had not seen him in a while and asked if he had a new phone number. Co-Conspirator 2 told the CI that he had a new phone number and social media account but would call the CI. CI-2 then exited the White Camry with the two AR style pistols wrapped in a blanket and returned to the CI vehicle.

65.     At approximately 12:46 p.m., the CIs departed the area. Around that time, surveillance units observed WILLIAMS walk west bound on East Taylor toward 2337 East Taylor Street. Co-Conspirator 2 departed the area driving the White Camry east bound on East Taylor Street. At that time, surveillance was terminated.

66.    A debrief of CI-1 and CI-2 was conducted by SA Smith and SA Prentice. CI-1 stated that WILLIAMS discussed committing fraud by cashing counterfeit checks, and robbing jewelry stores with the CIs. WILLIAMS stated that he robbed a jewelry store in Oakland called "Kim's" and took two hundred thousand dollars of jewelry. WILLIAMS further stated that his girlfriend cashes fraudulent checks for him. The CIs stated that WILLIAMS broke contact with them for a period of time and returned to the CI vehicle. CI-1 and CI-2 stated that the source for the firearms arrived at the deal in the White Camry detailed above. The CIs stated that they recognized the source of the firearms as Co-Conspirator 2 and CI-2 exited the CI vehicle to conduct the purchase. CI-2 stated that they got into the front passenger seat of the White Camry, and WILLIAMS and Co-Conspirator 2 were in the back seats. CI-2 stated that Co-Conspirator 2 told him/her he had a new phone number and social media account and would call the CI to arrange future firearms and narcotics purchases. CI-2 stated that they paid Co-Conspirator 2 in pre-recorded government funds in exchange for the two PMR AR style pistols. After the conclusion of the purchase, CI-2 broke contact with WILLIAMS and Co-Conspirator 2 and returned to the CI vehicle.

67.    It should be noted that because of unrelated previously conducted investigations, Co-Conspirator 2 believes CI-1 cooperates with and is a confidential informant for law enforcement. Following the conclusion of the deal, WILLIAMS blocked CI-1 and deleted his posts and stories from Instagram. In addition to blocking CI-1 on Instagram, WILLIAMS has not responded to messages from the CI.

**Multiple firearms sold by WILLIAMS traveled in interstate or foreign commerce**

68.     An investigation into the Glock 45, 9mm, bearing serial number BTGV58, that WILLIAMS sold to CI-1 on May 9, 2024, revealed that it was manufactured outside the State of California. Therefore, the firearm traveled in interstate and or foreign commerce.

69.      An investigation into the Glock 19, 9mm, bearing serial number BUAR511 that WILLIAMS sold to CI-1 on May 13, 2024, revealed that it was manufactured outside the State of California. Therefore, the firearm traveled in interstate and or foreign commerce.

70.     An investigation into the Glock 45, 9mm bearing serial number BYCH256, that WILLIAMS sold CI-1 on June 7, 2024, revealed that it was manufactured outside the State of California. Therefore, the firearm traveled in interstate and or foreign commerce.

71.     An investigation into the FN, FiveSeveN pistol bearing serial number 386350754, that WILLIAMS and Co-Conspirator 1 sold CI-1 on June 20, 2024, revealed that it was manufactured outside the State of California. Therefore, the firearm traveled in interstate and or foreign commerce.

72.     An investigation into the Century Arms, Micro Draco, pistol bearing serial number PMD-47663, that WILLIAMS and Co-Conspirator 1sold CI-1 on June 20, 2024, revealed that it was manufactured outside the State of California. Therefore, the firearm traveled in interstate and or foreign commerce.

73.     An investigation into the Glock 19, Gen 5, 9mm pistol bearing serial number BTCU944, that WILLIAMS and Co-Conspirator 1 sold CI-1 on June 27, 2024, revealed that it was manufactured outside the State of California. Therefore, the firearm traveled in interstate and or foreign commerce.

**Multiple firearms sold by WILLIAMS are classified as machine guns under the National Firearms Act (NFA) and Gun Control Act (GCA)**

74.     A "machine gun" as defined under 26 U.S.C. § 5845(b) and 18 U.S.C. 921(a)(24) as any weapon which shoots, is designed to shoot, or can be readily restored to shoot, automatically more than one shot, without manual reloading, by a single function of the trigger. The term shall also include the frame or receiver of any such weapon, any part designed and intended solely and exclusively, or combination of parts designed and intended, for use in converting a weapon into a machine gun, and any combination of parts from which a machine gun can be assembled if such parts are in the possession or under the control of a person.

75.     An investigation into the Glock 45, 9mm bearing serial number BYCH256, with an installed Machine Gun Conversion Device (MCD) that WILLIAMS sold to CI-1 on June 7, 2024, revealed that the firearm is designed to function as a machine gun.

76.     An instigation into the Glock 19, Gen 5, 9mm pistol bearing serial number BTCU944, with an installed Machin Gun Conversion Device (MCD) that WILLIAMS sold to CI-1 on June 27, 2024, revealed that the firearm is designed to function as a machine gun.

**WILLIAMS does not possess a Federal Firearms License (FFL)**

77.     Under federal law, it is necessary to possess a valid Federal Firearms License (FFL) to be engaged in the business of selling firearms.

78.     The ATF Federal Firearms Licensing Center (FFLC) issues and renews FFLs in accordance with the Gun Control Act of 1968.

79.     The FFLC database of FFLs is the Firearms Licensing System (FLS). SA Smith queried WILLIAMS through FLS and discovered that WILLIAMS does not hold a Federal Firearms License.

**WILLIAMS does not have firearms registered in the National Firearms Registration and Transfer Record (NFRTR)**

80.     The National Firearms Registration and Transfer Record (NFRTR) is the record of registered firearms regulated under the National Firearms Act (NFA) and is maintained by the ATF NFA Division.

81.     SA Smith queried WILLIAMS through the NFRTR and discovered that WILLIAMS does not have any NFA firearms registered to him.

## 82. **<u>CONCLUSION</u>**

83.     Based on the above, there is probable cause to believe that WILLIAMS committed the following crimes:

> <u>Count 1</u>: On or about June 7, 2024, Rayshawn WILLIAMS knowingly and intentionally possessed and transferred a machine gun in violation of 18 U.S.C. § 922(o)(1).
>
> <u>Count 2</u>: On or about June 27, 2024, Rayshawn WILLIAMS knowingly and intentionally possessed and transferred a machine gun in violation of 18 U.S.C. § 922(o)(1).

84.     *Sealing request*: The investigation of WILLIAMS and his co-conspirators remains ongoing.  ATF, in conjunction with Stockton PD and other law enforcement partners continue to conduct surveillance of various targets connected to WILLIAMS and, in order to maintain the secrecy of this investigation, this Affidavit respectfully requests that this Affidavit, the criminal complaint, and arrest warrant for WILLIAMS be placed under seal in order to avoid alerting WILLIAMS or his co-conspirators to the investigation.  In addition to the ongoing investigative operations, public filing of the criminal complaint against WILLIAMS could place law enforcement in danger because WILLIAMS has access to high-powered firearms and could use force to resist arrest or flee from the jurisdiction to avoid facing charges.  For these reasons, I

request that the Affidavit, criminal complaint, and arrest warrant be placed under seal until

further Order of the Court.

I swear under penalty of perjury, that the foregoing information is true and correct to the best of my knowledge, information and belief.

_____
/s/ Payton Smith
ATF Special Agent Payton Smith

SWORN to me over the telephone and SIGNED by me pursuant to Federal Rules of Criminal Procedure 4.1 and 4(d) on this  18th day of  October, 2024

_____
HONORABLE SEAN C. RIORDAN
UNITED STATES MAGISTRATE JUDGE

Approved as to form:

*/s/ Jason Hitt*
Jason Hitt
Assistant U.S. Attorney

<u>**United States v. Rayshawn WILLIAMS**</u>
**Penalties for Criminal Complaint**

<u>**Defendant**</u>
**Rayshawn WILLIAMS**


VIOLATIONS:        18 U.S.C. § 922(o) (2 counts) – Possession and transfer of a machine gun

PENALTIES FOR EACH COUNT:

                 A maximum term of 10 years in prison;
                 Fine of up to $250,000, or both fine and imprisonment;
                 Term up supervised release of up to 3 years

SPECIAL ASSESSMENT: $100 (mandatory on each count)